Exhibit 1

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   V.R., a minor, by and through her      )
     guardian ad litem Ariana Toscano,      )
 5   individually and as successor in       )
     interest to Juan Ramon Ramos, deceased;)
 6   and RAMONA TERRAZAS, individually,     )
                                            )
 7                    Plaintiffs,           )
                                            )
 8                    vs.                   )Case No.
                                            )5:19-CV-01023-JGB-SP
 9   COUNTY OF SAN BERNARDINO; GARY WHEELER;)
     THUN HOUN; JASON CALVERT; and DOES 4-  )
10   10, inclusive,                         )
                                            )
11                    Defendants.           )
     _____)
12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                   SERGEANT GARY WHEELER

16                  FRIDAY, DECEMBER 18, 2020

17

18

19

20

21

22

23   Reported Stenographically by:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  319099
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 10

1   captured the decedent at the time of the shooting?

2       A.   It should have.  I believe so, yes.

3       Q.   And the other videos that you have watched of the

4   other officers' body cams, do any of those show the decedent

5   at the time of the shooting?

6       A.   Yes.

7       Q.   Which one showed the decedent actually at the time

8   of the shooting?

9       A.   So to clarify, when you're saying at the time of the

10  shooting, are you talking about the entire event or the

11  actual shooting?

12      Q.   I'm talking about -- it's my understanding you fired

13  one shot; is that correct?

14      A.   Yes, sir.

15      Q.   So I'm wondering at the time you fired your shot, do

16  any of the body cams that you reviewed show the decedent at

17  the time you fired your shot?

18      A.   I can think of two videos that show it.

19      Q.   Which two are they, if you know?

20      A.   Definitely the Rialto K-9 officer, and I believe

21  Deputy Houn's.

22      Q.   Do you know how to spell his last name?

23      A.   Houn is H-o-u-n.

24      Q.   Thank you.

25      A.   You're welcome.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 12

```
 1        A.    I believe it was in July of 2013.

 2        Q.    And what was your initial assignment as a

 3   sergeant?

 4        A.    When I was promoted to sergeant I came out of our

 5   unit and went back to patrol.

 6        Q.    So you started out as a patrol sergeant?

 7        A.    Yes, sir.

 8        Q.    And were you a patrol sergeant at the time of this

 9   incident?

10        A.    Yes, sir.

11        Q.    Do you recall the date of the incident?

12        A.    I believe it was July 22, 2018.

13        Q.    And do you have an estimate as to what time,

14   approximately, you fired your shot?

15        A.    No, I don't.

16        Q.    Was it light outside?

17        A.    Daylight, yes.

18        Q.    Do you recall if it was morning or afternoon?

19        A.    It was in the afternoon.

20        Q.    What type of weapon did you fire?

21        A.    My duty weapon is a Glock-21, 45 caliber.

22        Q.    Had you ever fired that weapon in the line of duty

23   before?

24        A.    Yes.

25        Q.    On how many prior occasions?
```

1    Q.    Are you still assignment to patrol as a sergeant?

2    A.    Yes, sir.

3    Q.    Other than your firearm do you have any other type

4    of defense weapons on your person such as a Taser or pepper

5    spray or police baton?

6    A.    Yes.  I had all three that you mentioned.  The baton

7    would be the RCB, a collapsible metal baton.  Our Taser are

8    our standard issued X-26 Taser, and I had our OC spray.

9    Q.    Had you ever used your Taser in the field before?

10   A.    Yes.

11   Q.    On how many prior occasions?

12   A.    If I were to estimate it, maybe four our five

13   times.

14   Q.    Would that be both in the probe mode and drive-stun

15   mode?

16   A.    The probe mode's for sure, maybe once or twice in

17   the drive-stun.

18   Q.    How about your OC spray, had you used that before in

19   the field?

20   A.    Yes.

21   Q.    And do you have an estimate as to how many times?

22   A.    An estimate would be maybe eight to ten times.

23   Q.    And how about the police baton as an impact weapon,

24   had you ever used that before?

25   A.    No.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 16

1    Q.    Prior to the day of the incident do you have an

2    estimate as to how many times you have seen a suspect with a

3    gun in their hands?

4    A.    An estimate would be maybe ten times, give or

5    take.

6    Q.    How about a knife, what would your estimate be as to

7    how many times you've seen a suspect with a knife in their

8    hand?

9    A.    Ten to fifteen times would be a fair estimate.

10   Q.    How about a box cutter, do you recall ever seeing a

11   suspect specifically with a box cutter in their hand before

12   the day of this incident?

13   A.    Not right offhand, no.

14   Q.    Were you trained that you can use deadly force

15   against someone simply because they have a gun in their hand,

16   or does there have to be more?

17   A.    There would have to be more to that yes.

18   Q.    Were you trained that you can shoot someone merely

19   for having a knife in their hand?

20   A.    No.

21   Q.    And I would assume same would be of a box cutter.

22         Were you trained that you can shoot someone merely

23   for having a box cutter in their hand?

24   A.    No.

25   Q.    Do you now know the name of the decedent that you

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 18

1    he had prior -- I think the term was H & S, for Health and

2    Safety arrest, meaning, for drugs, illegal drugs, possession

3    and so forth.

4        Q.   Before the time you shot him did you have any

5    information that he had ever committed an act of violence

6    against another person?

7        A.   I didn't have that information.

8        Q.   Did you have any information that he had ever

9    injured another person?

10       A.   No.

11       Q.   Did you have any information that he had ever

12   verbally threatened to harm another person?

13       A.   No.

14       Q.   Did you have any information as to whether or not he

15   had a mental illness?

16       A.   No.

17       Q.   Other than some prior arrests for H & S, did you

18   have any other information about his background before you

19   fired your shot?

20       A.   No, sir.

21       Q.   Now, did you designate some officers as

22   less-than-lethal at the scene?

23       A.   Yes.

24       Q.   And did someone have a bean bag shotgun?

25       A.   That's correct.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 19

1        Q.   And who had that?

2        A.   That was Deputy Houn.

3        Q.   Did anyone have a Taser out, if you know?

4        A.   Yes.

5        Q.   And who had a Taser out?

6        A.   At one point I had my Taser out, and Sergeant

7   Calvert did.

8        Q.   So were there two sergeants at the scene at some

9   point?

10       A.   At some point as this evolved, yes.

11       Q.   In reviewing some of the materials, it's my

12   understanding there was a period of time where a white

13   vehicle that the decedent was in was stopped in front or near

14   a residence.

15            Is that your general recollection?

16       A.   Yes.

17       Q.   And do you recall what street that was?

18       A.   13th Street in the City of Highland.

19       Q.   And do you know which way that street runs in terms

20   of east, west, north, south?

21       A.   In that area of 13th, it would be east and west.

22       Q.   Do you know which way the front of the decedent's

23   vehicle was facing when it was in a stopped position?

24       A.   It was facing eastbound.

25       Q.   And were you present on-scene when that vehicle

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sergeant Gary Wheeler on 12/18/2020                    Page 20

1   initially came to that stopped position?

2       A.   Yes.

3       Q.   And did the driver remain in the vehicle for some

4   period of time before getting out?

5       A.   Yes.

6       Q.   And do you have an estimate as to how much time

7   passed from the time that vehicle first came to a stop in

8   that position to the driver getting out?

9       A.   My estimate would be probably maybe 45 minutes to an

10  hour.

11      Q.   And were you on-scene during that entire time?

12      A.   Yes.

13      Q.   And other than the officers you have already

14  mentioned, what other officers were on-scene, let's say as of

15  the time you fired your shot?

16      A.   We had our aerial unit which we designate as 40

17  King.  That's our helicopter unit.  And I don't know -- I

18  don't know who the operators were at this time.  There is

19  generally a pilot and an observer.  So there would be two

20  deputies there.  We had Deputy Alfredo Lopez from Central

21  Station.  And I don't know if I already mentioned it, but

22  Sergeant Calvert from Central Station --

23      Q.   Do you --

24      A.   I'm sorry.

25      Q.   I'm sorry.  Go ahead.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 21

1      A.   Did you want me to go through our lineup for

2   Highland also, or are you clear with that?

3      Q.   I think it would be good if you can go through it

4   just so we make sure we know who was there.

5      A.   So there was myself from Highland.  There was Deputy

6   Kuskowski, K-u-s-k-o-w-s-k-i, Deputy Charlie Lopez, and

7   Deputy -- I'm sorry.  I forgot -- the Rialto K-9 officer and

8   I'm sorry.  I don't know his name right offhand.

9      Q.   That's fine.  At some point after Mr. Ramos remained

10   in his car for an extended period of time, did you along with

11   the other officers come up with a tactical plan?

12      A.   Yes.

13      Q.   Can you please tell me what the tactical plan was as

14   you understood it?

15      A.   So Mr. Ramos had remained in the vehicle for some

16   time.  In doing so, he had -- the windows were closed, the

17   doors were closed, of course.  He had started the engine to

18   the car numerous times at least four to six times that I

19   recall hearing.  So I had talked with Sergeant Calvert about

20   deploying the OC spray into the car.

21            However, I had a concern with that in that I didn't

22   feel the car was demobilized.  It was still drivable.  It was

23   in Mr. Ramos's possession.  He was still in the driver seat.

24   There was a concern that if he became infected by the OC and

25   may drive off and be affected by the OC spray.  When I

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                           Page 22

 1   learned that the K-9 unit from Rialto was almost on-scene, I

 2   opted the talk to the K-9 handler and talked to him about the

 3   use of his K-9.

 4            And from that we developed a plan to introduce the

 5   K-9 into the scene by approaching the car on the right, on

 6   the right side passenger side, breaking the right front

 7   window so Mr. Ramos could audibly hear and see the dog and

 8   hopefully voluntarily come out and submit to arrest.

 9       Q.   And at some point was that tactical plan

10   attempted?

11       A.   Yes.

12       Q.   And prior to the tactical plan being implemented or

13   attempted to be implemented, did you have any information as

14   to whether or not Mr. Ramos had any weapons?

15       A.   Well, I visibly saw him with a box cutter that he

16   had.  So yes, I did have information that he had weapons.

17       Q.   Other than the box cutter, did you see or have

18   information about any other potential weapon on him or in the

19   car?

20       A.   No, sir.

21       Q.   For example, did anyone tell you that he had a

22   gun?

23       A.   No.

24       Q.   Did you have any information from any source that he

25   had a gun?

V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sergeant Gary Wheeler on 12/18/2020                    Page 23

```
 1      A.   No, sir.

 2      Q.   Did you ever see him trying to harm himself with the

 3   box cutter?

 4      A.   No, sir.

 5      Q.   During the time frame that he was in the car and it

 6   was stopped, you indicated that he started the car like four

 7   to six times; is that correct?

 8      A.   That's what I recall hearing the engine start.

 9      Q.   And then would there be times where it sounded like

10   he turned it off?

11      A.   Well, I don't recall hearing him turn the engine

12   off.  There was a lot of background noise, helicopter and

13   other dogs barking and such, some commands being shouted out

14   to him, but what did stand out to me was the starter or the

15   cranking of the engine.

16      Q.   When the car was in the stopped position, and I'm

17   talking about his car, Mr. Ramos's car --

18      A.   Yes.

19      Q.   -- were there any police vehicles close to it,

20   behind it, trying to prevent him, for example, from backing

21   up?

22      A.   My police unit, my patrol vehicle, yes.

23      Q.   Did you at some point position your patrol vehicle

24   directly behind his vehicle?

25      A.   Yes, sir.
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 24

 1        Q.    Do you have push bars on your vehicle?

 2        A.    Yes.   There was a push bar.

 3        Q.    Did you attempt to place your push bar against the

 4   rear of his car?

 5        A.    Yes.

 6        Q.    And was your purpose for doing that so that he

 7   couldn't try to back up?

 8        A.    Yes.   I didn't want him to be able to gain momentum

 9   or accelerate and begin ramming or trying to force his way

10   out of that area.

11        Q.    And how about like directly in front of him, you

12   indicated that one of your concerns about using pepper spray

13   in the car was that if he had attempted to drive off, it

14   affect his ability to drive?

15        A.    That's correct, sir.

16        Q.    And was there room for him to proceed forward?

17        A.    Yes.

18        Q.    And at any time before the tactical plan was

19   implemented with the K-9, did Mr. Ramos try to accelerate his

20   vehicle in reverse?

21        A.    No.   Not that I recall.

22        Q.    And at any time before the K-9 approached the

23   passenger side of his vehicle, did Mr. Ramos ever try to move

24   his vehicle forward?

25        A.    I don't recall seeing that, no.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 25

1      Q.   So is it your recollection that from the time you

2   saw his vehicle come to a stop in that position, it stayed in

3   the same position up until the time that the K-9 officer

4   approached the passenger side?

5      A.   Yes.

6      Q.   Based on the circumstances up to that point in time,

7   did you think deadly force would have been appropriate to use

8   against Mr. Ramos while he sat in the car?

9      A.   No.

10      Q.   And the pepper spray would be less-than-lethal; is

11   that correct?

12      A.   Yes, sir.

13      Q.   And also the K-9 would be less-than-lethal?

14      A.   That's correct.

15      Q.   Did you ever hear Mr. Ramos say anything while he

16   was in the car before the K-9 approached the passenger

17   side?

18      A.   I did not.

19      Q.   Did you ever observe family members out in the yard

20   at any point during this approximate 45 minutes to an hour

21   that the car was stopped?

22      A.   Yes.

23      Q.   Did you have an understanding at some point that

24   Mr. Ramos lived at that residence?

25      A.   No.  I didn't believe he lived there, no.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 27

1    Q.   Did you at least understand that there was some

2    connection between Mr. Ramos and these individuals out in the

3    yard?

4    A.   At that time I felt there was.

5    Q.   Either relatives or friends or something like

6    that?

7    A.   Yes.

8    Q.   So at some point the K-9 and the handler approached

9    the passenger side of the vehicle?

10    A.   Well, I approached the passenger side of the vehicle

11    to the closest to the door and window, and K-9 officer was

12    behind me.  An estimate would be maybe eight to ten feet

13    behind me to the south.

14    Q.   And what did you do when you approached the

15    passenger side?

16    A.   I used a tool known as a ram, a door ram, and I

17    smashed the right front window.

18    Q.   That would be the front window on the passenger

19    side?

20    A.   The right front door glass window, yes, sir.

21    Q.   And was your purpose in doing that is to create a

22    space that the K-9 can go into the car?

23    A.   Well, obviously, it was to alleviate the -- with the

24    glass window because the window was up, and was also to

25    create a clear -- and clear visible and audible situation for

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 28

1   Mr. Ramos to see there was a K-9 on-scene and so that he can

2   hear and see the dog.

3        Q.   And was part of the tactical plan then to have the

4   K-9 officer put the dog in the vehicle through the opened

5   window?

6        A.   We had discussed that.  When I say we, it was

7   myself, the K-9 officer.  We had discussed that, but there

8   was some reluctancy in that if Mr. Ramos had the utility

9   knife in hand, in his possession, we didn't want to send the

10   dog at that point to be injured or killed.

11        Q.   And is the reason that you wanted Mr. Ramos to see

12   the dog, so that in seeing that, it would hopefully scare him

13   and deter his conduct?

14        A.   No.  I wasn't trying to scare anybody.  I was trying

15   to get some compliance out of him, some voluntary compliance

16   and have him submit to arrest.

17        Q.   I understand.  I'm just wondering why did you think

18   it was beneficial for him to see the dog?

19        A.   It's been my experience that when a dog is

20   introduced into a situation and a suspect sees a K-9 or hears

21   a K-9, they generally will give up.

22        Q.   And was the dog barking at that point?

23        A.   Yes.

24        Q.   And do you generally recall what type of dog it

25   was?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 29

```
 1      A.   No.

 2      Q.   And after you smashed the right front window, did

 3   the car move forward?

 4      A.   Yes.

 5      Q.   And how much time passed from you smashing the right

 6   front window to the car moving forward?

 7      A.   If I were to estimate, two to five seconds, give or

 8   take.

 9      Q.   Was it generally a fairly short time in between you

10   smashing the window and the car moving forward?

11      A.   Yes.

12      Q.   When you ran up to the window to smash it, could you

13   see Mr. Ramos in the car?

14      A.   I can see his silhouette, yes.

15      Q.   Do you know if he had the box cutter in his hand at

16   that time?

17      A.   From what I recall I believe he had his hands on the

18   steering wheel.  I don't recall seeing a box cutter in his

19   hand.

20      Q.   And how far would you estimate the car moved forward

21   after you smashed the right front window?

22      A.   Maybe an estimate would be 40 to 50 feet, maybe.

23      Q.   Did it come to a stop again?

24      A.   Yes.

25      Q.   Now, I'm not so familiar with that area, but if the
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 30

 1   car wanted to continue moving forward, was there a pathway

 2   for it to do so?

 3        A.   There is a -- I guess for lack of better terms,

 4   utility easement or a dirt pathway that the vehicle could go

 5   down, yes.

 6        Q.   Was one of your concerns during this situation that

 7   he could take off and there could be a vehicle pursuit?

 8        A.   Yes.  That was a concern.

 9        Q.   And did you kind of alert your officers to be ready

10   for that in case that happens?

11        A.   I don't know if I specifically worded it as this

12   could end up into a another pursuit.  I think we were aware

13   of the situation, and at one time I believe our aerial unit

14   broadcasted that from their vantage point, it did appear the

15   vehicle could go down that alley way.

16        Q.   And was the airship overhead at the time of your

17   shot?

18        A.   Yes.

19        Q.   And I assume it was creating some noise?

20        A.   For lack of better terms, yes.  We were getting some

21   rotor wash from the helicopter, yes.

22        Q.   If you know, was it essentially orbiting above the

23   area?

24        A.   Yes.  It was in orbit.

25        Q.   Now, did you as part of your tactical discussion

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                              Page 32

1      Q.    So what was your understanding as to why he had the

2   bean bag?  Would that be in a scenario where Mr. Ramos exited

3   the vehicle and the bean bag would be a potential force

4   option?

5      A.    That's correct.

6      Q.    You didn't expect him to use the bean bag while

7   Mr. Ramos was in the vehicle, did you?

8      A.    Not at that point, no.  I didn't think it was going

9   to be used that way.

10      Q.    So after the car moved forward as you described,

11   after you broke out the front window, at some point did

12   Mr. Ramos exit the car?

13      A.    Yes.

14      Q.    And, obviously, he would have exited on the driver

15   side?

16      A.    He came out the left front driver's door.

17      Q.    And where were you in relation to your car or his

18   car or however you want to describe it when he initially came

19   out of the car?

20      A.    After the car pulled forward?

21      Q.    Correct.

22      A.    I was approximately 30, maybe 40 feet behind the car

23   closing in, walking towards the car.  So I was walking

24   eastbound.

25      Q.    Okay.  And it's my understanding from reviewing some

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                      Page 33

 1    of the materials that Mr. Ramos got out of the car and then

 2    at some point got back in the car; is that your

 3    recollection?

 4         A.   Yes.

 5         Q.   So just to make sure I had the chronology correct,

 6    the car was stopped in the same position for a lengthy period

 7    of time.  You went up to break the right front window which

 8    you did.  At some point after that the car moved forward as

 9    you described and came to a stop again.

10              Do I have that chronology correct so far?

11         A.   Yes.

12         Q.   And then after the car came to a stop again,

13    Mr. Ramos got out of the car, and then after some period of

14    time he got back in the car?

15         A.   Well, when you say some period of time, it was

16    almost immediate he came out.  I believe he was the

17    less-lethal.  The bean bag was deployed, and then he

18    immediately went back into the car.

19         Q.   So that was my next question.

20              How much time do you think passed from him getting

21    out to getting back in?  Just a few seconds?

22         A.   That would be fair to say.  Maybe two to five

23    seconds, maybe, yes.

24         Q.   And during there time frame did you hear the bean

25    bag shotgun being deployed?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                      Page 34

```
 1      A.   I'm sorry.  Did I hear it?

 2      Q.   Yes.  Did you hear it?

 3      A.   Yes.

 4      Q.   Did you recognize it as the bean bag shotgun?

 5      A.   Yes.

 6      Q.   And based on your knowledge, did you assume that was

 7 Deputy Houn?

 8      A.   Yes.

 9      Q.   And how many deployments did you hear at that

10 time?

11      A.   I heard two.

12      Q.   Did you hear any Tasers at that point?

13      A.   Not at that point, no.

14      Q.   And had you shot at that point?

15      A.   No, sir.

16      Q.   Were you able to see Mr. Ramos when he got out of

17 the car during that approximate two to five seconds?

18      A.   Yes.

19      Q.   What did you see him doing?

20      A.   He exited the -- from a seated position he got out

21 of the car.  The door was opened.  So he was standing in the

22 immediate area of the door.  As his body swung, as his body

23 swung to the right -- so he was facing us now, I could see

24 that he had the utility knife, the box cutter in his right

25 hand.  And I could see him -- he appeared to be flinching
```

 1    from -- possibly being hit with the bean bags that were fired

 2    at him, and then he went back in the car and closed the

 3    door.

 4        Q.   And how far would you estimate you were from him

 5    during that sequence?

 6        A.   Approximately 30 feet.

 7        Q.   Did you see him attempting to attack anyone with the

 8    box cutter during that sequence?

 9        A.   No.

10        Q.   Did you say anything to him during that short time

11    he was out of the car at that point?

12        A.   Yes.  I recall I made -- in my mind, I thought he

13    was -- I didn't know if he understood English or not.  So I

14    was calling him "amigo" or friend.

15        Q.   And did you hear any officers give him any commands

16    during that two to five seconds when he initially got out of

17    the car?

18        A.   I recall at least one command saying drop the knife.

19             I don't know who said it.

20        Q.   All right.  And do you know if that was said in

21    English or Spanish?

22        A.   I heard the English version of it.

23        Q.   And then would it be fair to say that very soon

24    after the bean bag was deployed, he got back in the

25    vehicle?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 36

```
 1     A.   Yes.

 2     Q.   Did he close the door again?

 3     A.   To me it appeared that he closed the door, yes.

 4     Q.   And then how much time passed before he got out

 5  again?

 6     A.   A few seconds.

 7     Q.   And when he got out again, where were you positioned

 8  at that point?

 9     A.   I was probably still in the same general area,

10  behind Mr. Ramos's car and the left rear quarter panel, the

11  trunk area.

12     Q.   And how many feet would you estimate you were from

13  Mr. Ramos when Mr. Ramos got out that second time?

14     A.   Maybe 20 to 30 as an estimate.

15          MR. GALIPO:  So I have been going about an hour.

16          I promised that I would take a five-minute break

17  after an hour.

18          Is this a good time for everyone to take a

19  five-minute break?

20          MR. FUJII:  I've been drinking coffee.  I can use a

21  break.

22          MR. GALIPO:  Okay.  You got it.

23          Off the record.

24          (Recess taken.)

25  BY MR. GALIPO:
```

 1   Lopez, the Kuskowski, the Houn, and Dane Stordall [phonetic]

 2   which is the Rialto K-9 officer.

 3          MR. GALIPO:  Okay.  Thank you.

 4   BY MR. GALIPO:

 5      Q.   So let me just show you a few photos.  I'm going to

 6   mark a few exhibits.  We premarked some of these numbers, but

 7   I'm not going to use all of them.

 8          MR. GALIPO:  But Exhibit 1 will be what was marked,

 9   Renee, as Item 1.  We'll make that Exhibit 1.

10          Can we try to share screen so everyone can see it?

11          MS. MASONGSONG:  Yes.  No problem.

12          (Exhibit 1 was marked for identification.)

13   BY MR. GALIPO:

14      Q.   Okay.  So my first question is can you see this

15   photograph on your screen?

16      A.   Yes.

17      Q.   And is that a photograph of you?

18      A.   Yes.

19      Q.   Would that have been taken on the day of the

20   incident sometime after the shooting?

21      A.   Yes.

22      Q.   Is that generally the type of uniform you had on at

23   the time?

24      A.   Yes.

25      Q.   The yellow device on your left hip, is that your

V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sergeant Gary Wheeler on 12/18/2020                        Page 39

```
 1    Taser?
 2         A.    Yes, sir.
 3         Q.    And your holster with your firearm would be on your
 4    right side?
 5         A.    Correct.
 6         Q.    I take it you're right-handed?
 7         A.    That's correct.
 8         Q.    And can we see in this photograph where your body
 9    cam would be?
10         A.    So it's -- again, it's behind my shirt, but you can
11    see the opening below the lapel mic.  I guess it's that black
12    area between the buttons of the shirt.
13         Q.    And it looks like at least in this picture, you have
14    sunglasses on?
15         A.    Yes.
16         Q.    Did you have those glasses on at the time of the
17    shooting?
18         A.    I believe I did, yes.
19               MR. GALIPO:  Can we look at Exhibit 2, which will be
20    the same as Item 2, Renee.
21               (Exhibit 2 was marked for identification.)
22    BY MR. GALIPO:
23         Q.    That's also a photograph of you taken on the day of
24    the shooting sometime afterwards?
25         A.    Yes.
```

 1      Q.    And then which direction did Mr. Ramos run after

 2   getting out of the vehicle?

 3      A.    He took off northbound.

 4      Q.    Do you see a telephone pole in this photograph?

 5      A.    Yes, sir.

 6      Q.    At some point would he have run by the telephone

 7   pole with the pole to his left?

 8      A.    Yes.

 9      Q.    Do you know whether you shot him before or after he

10   ran by the telephone pole?

11      A.    It would have been after.

12      Q.    How far past the telephone pole do you think he was

13   when you shot him?

14      A.    An estimate approximately would be maybe 15 to 20

15   feet from the pole, or are you asking --

16      Q.    From the pole.

17      A.    Maybe 15 to 20 feet.

18      Q.    And it looks like there is like a chain link fence

19   next to the pole as we look at this picture to the right of

20   the pole?

21      A.    So I have your caption, your video caption kind of

22   covering that area, but it does from what I could see, it

23   looks like it may be a chain link fence.

24      Q.    Do you recall Mr. Ramos being near a chain link

25   fence when you fired your shot?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 46

1    area that he got out of the car to where he was when you shot

2    him?

3         A.    So the distance from his car?

4         Q.    Yes.  From the driver's door area to where he was

5    when you shot him.

6         A.    Maybe 25 to 30 feet as an estimate.

7         Q.    And when you shot him was he stationary or moving?

8         A.    He was running.

9         Q.    And which direction was he running?

10        A.    Initially he started northbound.

11        Q.    How far approximately did he run northbound?

12        A.    Again, he was maybe 30 feet as an estimate from the

13    car.  Are you talking total or -- the reason why I'm asking

14    is after I fired my shot he continued running, so.

15        Q.    I get that.  Let's try -- I'm going to try to focus

16    these next group of questions up to the time you fired your

17    shot, and then I'll have some questions after that.

18             So we don't get confused.

19        A.    Okay.

20        Q.    So at the time you fired your shot, was Mr. Ramos

21    running northbound?

22        A.    Yes.

23        Q.    And how far do you think he had run northbound as of

24    the time you fired your shot?

25        A.    An estimate would be maybe 25 to 30 feet from the

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 47

1    car.

2        Q.   And at some point after you fired your shot did he

3    climb over a fence?

4        A.   Afterwards, yes.

5        Q.   Now, did you say anything to Mr. Ramos in between

6    the time he got out of the car the second time and the time

7    you fired your shot?

8        A.   From what I recall, I may have yelled out he still

9    has the knife, and I think I began calling Mr. Ramos amigo or

10   things of that nature.

11       Q.   Did you ever, for example, give him a command to

12   drop it?

13       A.   No.

14       Q.   Did you ever tell him to get on the ground?

15       A.   Not that I recall.

16       Q.   Did you ever tell Mr. Ramos to put his hands up?

17       A.   I didn't, no.

18       Q.   Did you give him any verbal warning that you were

19   going to shoot him if he did or didn't do something?

20       A.   No.   I didn't have an opportunity to.

21       Q.   And how far do you think you were from him when you

22   fired your shot?

23       A.   An estimate would be maybe 30 or 40 feet.

24       Q.   And looking at this photograph, where were you

25   approximately in relation to the vehicles to the pole or the

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 48

```
 1   fence when you fired?
 2        A.   From what I recall -- so you can see the -- if
 3   you're looking at the utility pole and that gray -- I think
 4   it's a Dodge Charger.  So I may refer to it as a Dodge
 5   Charger.  That gray Dodge Charger, there is the left trunk
 6   area where the license plate is shown.  I was in that general
 7   area off of the trunk of that car.
 8        Q.   And were you stationary or moving when you fired?
 9        A.   When I fired I was stationary.
10        Q.   And did you have the gun in one hand or two?
11        A.   I used the two-handed grip.
12        Q.   And were you aiming center mass?
13        A.   Yes.
14        Q.   And were you using your sights?
15        A.   Yes.
16        Q.   What part of Mr. Ramos's body were you aiming at?
17        A.   Initially, it was his rear side or his back.
18        Q.   And is that because he was running away from you at
19   that point?
20        A.   That was the only side of picture I had of
21   Mr. Ramos, yes.
22        Q.   And was there any officer closer to Mr. Ramos than
23   you were when you fired?
24        A.   No.
25        Q.   And you're estimating you were about 20 or 25 feet?
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sergeant Gary Wheeler on 12/18/2020                    Page 49

1          What would be your estimate as to how far you were

2     from Mr. Ramos when you fired?

3          MR. FUJII:  Objection.  Misstates prior testimony.

4     BY MR. GALIPO:

5     Q.   Let me ask it.  I think I asked him before how far

6     from the car so I just want to be clear.

7          How far were you from Mr. Ramos when you fired?

8     A.   I would estimate 35, maybe 40 feet.

9     Q.   And based on your observations at the time, you

10    would have been the closest officer to him when he fired; is

11    that correct?

12    A.   Yes.

13    Q.   And you would have fired at him before he went over

14    the fence?

15    A.   Yes.  It was before he went over the fence.

16    Q.   And where was he running as he was going northbound

17    at the time you fired?  In other words, was he on this dirt

18    pavement?  What surface was he running on?

19    A.   He was on the dirt.

20    Q.   And --

21    A.   So if I can clarify from this picture, there is two

22    sections of the dirt.  There is a wash or culvert.  It would

23    be the dirt section that's closest to the cinder block wall

24    to the left.  He was not up against the cinder block wall,

25    but he was on the dirt portion on that area.

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 50

1      Q.    So as we look at the photograph, it would be the

2   dirt portion on the left side of the photograph?

3      A.    Yes.  Not nearest to the chain link fence.

4      Q.    Thank you.  And where was he running in this dirt

5   portion on the left side of the photograph?  More or less in

6   the middle of it?

7      A.    From what I recall he was more towards the drainage

8   culver, maybe three to four feet away from that.

9      Q.    So as we look at this photograph, it would have been

10  closer to the right side of the dirt closer to the drainage

11  ditch further from the cinder block wall?

12     A.    Yes.

13     Q.    And you, again, would have been positioned near the

14  rear of the gray Charger?

15     A.    Yes.

16     Q.    Now, did you hear any other rounds being fired in

17  between the time Mr. Ramos got out of the car the second time

18  and the time you fired such as Taser, bean bag, anything like

19  that?

20     A.    I believe I heard a bean bag round and a Taser.

21     Q.    And did you hear both of those before you fired?

22     A.    Yes.

23     Q.    And how many bean bag rounds did you hear?

24     A.    From what I recall, one.

25     Q.    And how many Taser deployments did you hear up until

```
 1        Q.   And how about the Taser, do you know who deployed
 2   the Taser?  At least do you know now?
 3        A.   I know now it was Sergeant Calvert.
 4        Q.   Do you have an impression as to where the sergeant
 5   was at that point?
 6        A.   I believe it was in the same general area off of
 7   that right side of that vehicle, that Dodge Charger.
 8        Q.   Prior to you firing your shot at Mr. Ramos, did you
 9   see Mr. Ramos trying to attack anyone with the box cutter?
10        A.   Well, at this scene, no.
11        Q.   Do you see him -- and this again is prior to you
12   firing your shot.
13             Did you see him trying to stab anybody with the box
14   cutter?
15        A.   No.
16        Q.   Did you see him trying to hurt himself with the box
17   cutter at any time before you fired the shot?
18        A.   No.
19        Q.   And before you fired the shot did you have any
20   information that Mr. Ramos had seriously injured or killed
21   any person?
22        A.   No.
23        Q.   You indicated that you were the closest person of
24   the police officers to Mr. Ramos when you fired; correct?
25        A.   It would have been -- from what I recall, I was the
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                     Page 53

```
 1   closest of the deputies.  However, the K-9 officer was to my

 2   right, but I was in front of the K-9 officer.

 3       Q.   So would you have been a little bit closer to

 4   Mr. Ramos than the K-9 officer when you fired?

 5       A.   From what I recall, yes.

 6       Q.   And you're estimating that distance to be 35 to 40

 7   feet?

 8       A.   My distance from Mr. Ramos to myself, yes.

 9       Q.   At the point you fired did you see anybody else on

10   the side of the this chain link fence other than Mr. Ramos?

11       A.   On the same side?

12       Q.   Yes.  On the same side.

13       A.   Not in this immediate area, no.

14       Q.   Did you see anyone else on this dirt area other than

15   Mr. Ramos when you fired?

16       A.   Yes.

17       Q.   And who did you see?

18       A.   I didn't know at the time, but I saw a marked

19   Sheriff's unit at the end of the dirt alley way or the

20   easement, and it was later determined that was Deputy Alfredo

21   Lopez.  He was standing out by the left front of his patrol

22   vehicle.

23       Q.   When you say you didn't know it at the time, you

24   mean you didn't know it was a deputy, or you didn't know it

25   was Lopez, or what do you mean?
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 54

```
 1      A.   I'm sorry.  I didn't know the identity of the deputy
 2   as being Deputy Alfredo Lopez.
 3      Q.   And how far was Deputy Lopez from Mr. Ramos when you
 4   fired your shot?
 5      A.   And estimate would be a 100 and maybe 120 feet.
 6      Q.   Was there anyone closer to Mr. Ramos when you fired
 7   your shot other than you?  And this would include law
 8   enforcement or citizens.
 9      A.   No.
10      Q.   How would you describe Mr. Ramos's gait when you
11   shot him?  Would he have been running fast, jogging?
12           How would you describe it?
13      A.   I believe he was at a full run.  To me it appeared
14   he was at a full run, and he was increasing distance away.
15      Q.   Was he pumping his arms?
16      A.   When you say pumping, you mean swinging from side to
17   side?
18      Q.   Yes.
19      A.   Yes.  From what I recall.  And then at some point as
20   he is doing that, he turned to his left.
21      Q.   Did he turn to his left before or after you shot
22   him?
23      A.   He -- well, I was -- before, and then I shot him.
24      Q.   So are you saying his left backside was exposed to
25   you when you shot?
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 58

 1  was shot?  Can you put that up?

 2          MS. MASONGSONG:  Yes, I can.  Just give me one

 3  minute.

 4          (Exhibit 9 was marked for identification.)

 5  BY MR. GALIPO:

 6      Q.   Okay.  So this is a still taken from a video.

 7          Can you tell by looking at this whether you had

 8  fired your shot yet or not?

 9      A.   I believe this -- from what I recall, this would be

10  after the shot was fired.

11      Q.   And you indicated before he was on this dirt area

12  going northbound a few feet from the cement to the left.

13  That would put him in about the position you earlier

14  described in this photograph?

15      A.   Yes.

16      Q.   And do you know if he had the box cutter in either

17  hand at this point?

18      A.   The last time I saw it -- at this point, or when

19  I -- before I fired?

20      Q.   Let's let me ask you both.

21          At this point do you know where the box cutter

22  was?

23      A.   Looking at this photo, no.  I did not know where the

24  box cutter was.

25      Q.   When was the last time you saw the box cutter before

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                           Page 59

1    you fired?

2        A.    As he began down the trail, the dirt trail.  It was

3    in his right hand.

4        Q.    How many seconds had passed since you last saw the

5    box cutter before you fired?

6              Would it just be a couple seconds?

7        A.    That could be fair to say, maybe two or three

8    seconds, yes.

9        Q.    So you believe this would be showing the decedent a

10   short time after you fired your shot; is that correct?

11       A.    Yes.

12       Q.    And so that's Exhibit 9?

13             And I just have a few more photos to show you.

14             MR. GALIPO:  I think Item 51, Renee, as Exhibit

15   10.

16             (Exhibit 10 was marked for identification.)

17             MR. FUJII:  Dale, can we take a break after this

18   photo?

19             MR. GALIPO:  Sure.

20             MS. MASONGSONG:  I'm getting the photo up.  One

21   second.

22   BY MR. GALIPO:

23       Q.    Okay.  So this would be Exhibit 10.

24             Do you see Mr. Ramos in the open door area of his

25   vehicle in this photograph?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 60

```
 1      A.   Yes.

 2      Q.   And given the position of the vehicle, would this be

 3   after he got out -- strike that.

 4           Can you tell whether this would be the first time he

 5   got out or the second, or it's hard to tell?

 6      A.   From what I recall, this would be the first time.

 7      Q.   That's fine.

 8           MR. GALIPO:  Why don't we go off the record and

 9   we'll take a break to accommodate counsel.

10           Is five minutes good?

11           MR. FUJII:  Yes.

12           MR. GALIPO:  Yes.  Let's do it.

13           (Recess taken.)

14   BY MR. GALIPO:

15      Q.   Just to make sure I understand the sequence, when

16   you fired your shot, you were near the rear of the Charger?

17      A.   Yes.

18      Q.   And Mr. Ramos was generally running away from where

19   you were?

20      A.   He was running northbound, yes.

21      Q.   And when you fired your shot, you're estimating, I

22   think he was 35 to 40 feet from you?

23      A.   From what I recall, yes.

24      Q.   And over a 100 feet from who you now know to be

25   Deputy Lopez?
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                               Page 70

 1    that point.

 2        Q.    You didn't learn at any time while you were on-scene

 3    that the family took it from him?

 4        A.    While I was on-scene, no.

 5        Q.    Did you see him ever try to attack any of the family

 6    members with the box cutter?

 7        A.    I didn't see that, no.

 8        Q.    Did you see any injuries on any of the family

 9    members?

10        A.    Not that was reported to me, no.

11        Q.    Did you see injuries at some point on Mr. Ramos?

12        A.    Yes.

13        Q.    And do you see the blood or some blood in this

14    photograph on the cement and by the open doorway?

15        A.    I do, yes.

16        Q.    You recall at some point you observed Mr. Ramos

17    bleeding?

18        A.    Yes.

19        Q.    And was he handcuffed?

20        A.    Well, yes.  We did handcuff him as this grassed,

21    yes.

22        Q.    And at the time he was handcuffed you would have

23    already noticed that he was bleeding?

24        A.    Well, yes.  I knew he was bleeding, yes.

25        Q.    Was medical staged for this incident?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                               Page 71

1    A.    Yes, sir.

2    Q.    And is that because of the potential for the Taser

3    and the bean bag being used?

4    A.    Not only that.  It was just to have them on standby

5    in case there was a dog bite or bystanders were hurt or

6    officers were hurt or Mr. Ramos was hurt in any way.

7    Q.    So was there any discussion about releasing the K-9

8    if Mr. Ramos started to run away from the car?

9    A.    I don't recall that.

10    Q.    But your less-than-lethal options that you were

11    aware of at least were the Taser, the bean bag, and the

12    K-9?

13    A.    The less-than-lethal, yes.

14    Q.    And where were the paramedics staged in relation to

15    this house?

16    A.    The only thing I remember being reported to me was

17    they were to be west or our location.

18    Q.    And --

19    A.    On 13th Street is what I believed that to mean.

20    Q.    And were you the one that had to give them clearance

21    as to when they could come in being that you were the

22    sergeant on-scene?

23    A.    Are you asking me if I was the one that had to be

24    turning back there, or did I?

25    Q.    Both.  In other words, usually, when paramedics are

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 73

```
 1   BY MR. GALIPO:
 2       Q.   Sergeant Wheeler, I'm going to try that again just
 3   to make sure you understand it.
 4            I was asking you how much time passed after you
 5   fired your shot until you okay'd the paramedics to come in to
 6   treat Mr. Ramos.
 7       A.   Again, from what I recall, it was maybe within that
 8   time period, five, ten seconds or so, maybe.
 9       Q.   Where were you when you okay'd them to come in?
10            Were you in the property or outside or where were
11   you?
12       A.   I was -- when I okay'd medical to come to tend to
13   Mr. Ramos, I was in this general porch area.
14       Q.   And was Mr. Ramos still alive at that point?
15       A.   Yes.
16       Q.   Did you hear him saying anything or make any sounds
17   at that point?
18       A.   I didn't.  No.
19       Q.   Did you hear the family members saying anything at
20   that point?
21       A.   They were saying things, but I couldn't recall what
22   was being said.
23       Q.   If you know, where were some of the family members
24   out in the front yard at the time of the shooting?
25       A.   Yes.
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 74

```
 1      Q.   Okay.  So you just fired the one shot; is that

 2   correct?

 3      A.   Yes.

 4      Q.   So do you know if anyone other than you used deadly

 5   force?

 6           MR. FUJII:  Objection.  Vague.

 7           Are you talking at the scene?

 8           MR. GALIPO:  Yeah.  At the scene.

 9   BY MR. GALIPO:

10      Q.   In other words, were you the only officer, to your

11   knowledge, to use deadly force?

12      A.   To my knowledge, yes.

13      Q.   And when Mr. Ramos was climbing over the fence, was

14   any force used against him at that time, if you know?

15      A.   I don't know.

16      Q.   After Mr. Ramos got into the yard, was any force

17   used against him, if you know?

18      A.   I don't know.

19      Q.   At some point you gave a statement following the

20   incident?

21      A.   Yes.

22      Q.   And when did you give your statement in relation to

23   the incident?

24      A.   I believe it was within a week time, maybe five days

25   afterwards, five or six days afterwards.
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                                    Page 75

```
 1      Q.   Did you have an attorney present at the time?

 2      A.   Yes.

 3      Q.   And you've had a chance to review your statement

 4   recently?

 5      A.   Yes.

 6      Q.   Your training with respect to the use of deadly

 7   force, were you generally trained that deadly force was the

 8   highest level of force an officer can use?

 9      A.   I'm sorry.  The highest level?  Yes.

10      Q.   And were you trained that deadly force should only

11   be used if there is an immediate or imminent threat of death

12   or serious bodily injury?

13      A.   Yes, sir.

14      Q.   When you went to the police academy way back when,

15   do you recall studying POST Learning Domains?

16      A.   Actually, they were referred to as Knowledge

17   Domains, but yes.

18      Q.   Okay.  Not to date yourself at all, but --

19      A.   Right.

20      Q.   -- and do you recall that some of the training in

21   the Knowledge Domains or Learning Domains was that deadly

22   force should be a last resort?

23      A.   Yes.

24      Q.   And do you recall that deadly force should only be

25   used in the direst of circumstances?
```

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 76

1          Do you recall that as part of your training?

2      A.   Yes.

3      Q.   And do you recall being trained on the reverence for

4  human life?

5      A.   Yes.

6      Q.   And do you recall being trained that a verbal

7  warning that you're going to use deadly force should be given

8  when feasible?

9      A.   I would agree with that statement, yes, when

10  feasible.

11      Q.   And you only fired one shot.

12          Is that in part because of the background?

13      A.   My shooting background?  Is that what you mean?

14      Q.   Yes.

15      A.   Yes.  That was the only opportunity I had to stop,

16  correct.

17      Q.   Could you tell whether your shot struck him or

18  not?

19      A.   Immediately, no.  I didn't know.

20      Q.   When did you first believe your shot struck him?

21      A.   When I reached him at the porch, the front porch

22  area of the house.

23      Q.   Your weapon, to your knowledge, can it fire about

24  four shots a second if you're pressing the trigger in rapid

25  succession?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 77

 1      A.   I don't know.  I don't know.

 2      Q.   Okay.  But the reason you only fired one shot is --

 3   can you explain that to me, please?

 4      A.   Yes.  As Mr. Ramos began running down a dirt path,

 5   he bladed himself to the left as I got in my shooting

 6   position.  I believe he was turning towards the fence line to

 7   go into the yard of the house on 13th Street.  I recall

 8   seeing the family members and at least one family member in

 9   that front yard area of the house on 13th Street.

10          And as I took my shooting position, I could clearly

11   see I had the one deputy, Alfredo Lopez, down range, so to

12   speak.  And as Mr. Ramos continued to further his distance

13   from us, and he momentarily turned and bladed towards the

14   fence, I only had the short opportunity to take that one shot

15   and try to alleviate the threat of Mr. Ramos going into that

16   yard to cause injury to those people or even to continue to

17   attack the deputy.

18      Q.   When you say to continue to attack the deputy,

19   you're talking about Deputy Alfonso Lopez?

20      A.   Yes, sir.

21          MR. FUJII:  Alfredo.

22          THE WITNESS:  I'm sorry.  Alfredo, yeah.

23   BY MR. GALIPO:

24      Q.   Alfredo Lopez.  And I think you told me he was over

25   a 100 feet away?

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                              Page 78

```
 1      A.   That's where I recall him being, about 100 feet

 2   away.

 3      Q.   And I think you already told me this, but you never

 4   saw Mr. Ramos attempting to attack Alfredo Lopez, did you?

 5      A.   I never saw that, no.

 6      Q.   And you never saw Mr. Ramos attempting to attack any

 7   of the family members or people in the front yard, did you?

 8      A.   Not while I was there, no, he did not.

 9      Q.   When you shot Mr. Ramos, the people that you saw in

10   the front yard would have been on the opposite side of the

11   fence that Mr. Ramos was; is that fair?

12      A.   In the front yard area, yes.

13      Q.   And would they have been about 50 feet away from

14   him, or what would be your estimate as to how far they were

15   from Mr. Ramos when you fired your shot?

16      A.   Well, I don't recall.  There was probably four or

17   five people at least in that yard.  I do recall seeing one

18   person towards the front middle of that yard, and I were to

19   estimate, he would have been maybe 40 to 50 feet, maybe 45

20   feet in the yard.

21      Q.   But Mr. Ramos was about ten feet from the fence when

22   you shot him?

23      A.   I don't know.

24      Q.   So Mr. Ramos would have been maybe what -- 50 or 60

25   feet to that closest person in the front yard?
```

1          MR. FUJII:  Objection.  I think that misstates his

2     testimony.

3          MR. GALIPO:  It may.  I'm just trying to get it

4     clear.

5     BY MR. GALIPO:

6     Q.   You said the person was 40 to 50 feet in the front

7     yard, and then I'm imagining Mr. Ramos is some distance from

8     the fence.  So I was trying to put the two together to figure

9     out how far that person in the middle of the front yard was

10    to Mr. Ramos when you shot.

11    A.   Right.  From what I recall, he was the person in the

12    front yard.  I could see out of my peripheral, my side

13    vision, was approximately 40 to 45 feet away from

14    Mr. Ramos.

15    Q.   Okay.  Did you ever hear Mr. Ramos say anything?

16    A.   No.

17    Q.   Did you form a specific opinion as to whether he was

18    under the influence of alcohol?

19    A.   I didn't have an opportunity.

20    Q.   Did you form a specific opinion as to whether he was

21    under the influence of drugs?

22    A.   I -- he was displaying erratic behavior, but I

23    didn't have an opportunity to evaluate him.

24    Q.   How did all of this start, if you know?

25         In other words, what alerted deputies initially to

1    Mr. Ramos?

2         A.   A reckless driver call into our Sheriff's dispatch

3    from a citizen.

4         Q.   Were there any accidents that you were aware of?

5         A.   I'm sorry.  Can you clarify?  You mean during the

6    call or?

7         Q.   Yes.  In other words, did you have any information

8    that he was involved in a vehicle collision?

9         A.   No.  I believe he was -- it was broadcasted that he

10   was cutting off vehicles and driving recklessly.

11        Q.   And where was his vehicle when you first saw him?

12        A.   He was on Victoria Avenue, near 14th Street,

13   traveling southbound on Victoria.

14        Q.   And how much time passed from the time you first saw

15   him to the time he ended up in front of the property where we

16   see the car in the photographs?

17        A.   I am going to say less than five minutes if I were

18   to estimate on it.

19        Q.   Was it generally a slow speed pursuit?

20        A.   Initially when I first saw him and I confirmed that

21   it was the vehicle we're talking about in the call, I

22   activated my emergency lights to attempt to get him to yield

23   and pull over to the right.  Our speed was probably -- I

24   don't know, maybe 35, maybe 40.  I didn't feel he was trying

25   to avoid or flee from me at that time, but I felt there might

**V.R., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sergeant Gary Wheeler on 12/18/2020**                    Page 81

```
 1   have been some confusion on his behalf because he didn't

 2   immediately pull over.  And he went through the red light at

 3   the next intersection.

 4       Q.   And then what was the speeds, generally, from that

 5   point to the point where he came to stop in front of the

 6   residence?

 7       A.   So when he -- when I initially -- after him and he

 8   got back in the vehicle and split, the speeds were maybe 40

 9   miles-an-hour to 45, somewhere around there.

10       Q.   Were there any accidents during that pursuit?

11       A.   None that were reported to me, no.

12       Q.   Okay.

13            MR. GALIPO:  Let's take our last break.  I think I'm

14   just about done, but if it's okay with everyone, we can go

15   off the record and take another five-minute break.

16            MR. FUJII:  All right.

17            (Recess taken.)

18   BY MR. GALIPO:

19       Q.   I think you told me earlier that at some point you

20   indicated that the object that he had was a box cutter; is

21   that correct?

22       A.   That's what I recognized it as, a box cutter, a

23   utility knife, yes.

24       Q.   And could you see the box cutter at the time you

25   fired your shot?
```

1     A.   Yes.  There was a point I could still see him

2  running with it in his hand.

3     Q.   And would that be right before you fired?

4     A.   That would be correct.

5     Q.   All right.  And could you tell how much of the blade

6  was exposed?

7     A.   When I fired?

8     Q.   At any time.

9     A.   Well, I recall earlier in my contact with him the

10  blade being fully exposed, yes.

11     Q.   When you say fully exposed, is about a half an inch,

12  or how far was it exposed when you saw it?

13     A.   I think that would be a fair statement

14          Maybe an inch, maybe an inch and a half, yes.

15     Q.   But you recognized it as something other than a

16  knife?

17     A.   Yes.

18     Q.   Do you know if the Sheriff's Department reviewed

19  your shooting to determine whether it was in policy or not?

20     A.   I believe so.  Yes, they did.

21     Q.   And do you know what they found?

22          In other words, did they find the shooting to be in

23  policy, if you know?

24     A.   I believe -- yes, it was found to be within

25  policy.