# EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4    V.R., a minor, by and through her       )
      guardian ad litem Ariana Toscano,       )
 5    individually and as successor in        )
      interest to Juan Ramon Ramos, deceased;)
 6    and RAMONA TERRAZAS, individually,      )
                                              )
 7                  Plaintiffs,               )
                                              )
 8              vs.                           )Case No.
                                              )5:19-CV-01023-JGB-SP
 9    COUNTY OF SAN BERNARDINO; GARY WHEELER;)
      THUN HOUN; JASON CALVERT; and DOES 4-   )
10    10, inclusive,                          )
                                              )
11                  Defendants.               )
      _____)
12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    SERGEANT GARY WHEELER

16                  FRIDAY, DECEMBER 18, 2020

17

18

19

20

21

22

23    Reported Stenographically by:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:   319099
```

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   V.R., a minor, by and through her    )
     guardian ad litem Ariana Toscano,    )
 5   individually and as successor in     )
     interest to Juan Ramon Ramos, deceased;)
 6   and RAMONA TERRAZAS, individually,   )
                                          )
 7                  Plaintiffs,           )
                                          )
 8                  vs.                   )Case No.
                                          )5:19-CV-01023-JGB-SP
 9   COUNTY OF SAN BERNARDINO; GARY WHEELER;)
     THUN HOUN; JASON CALVERT; and DOES 4- )
10   10, inclusive,                       )
                                          )
11                  Defendants.           )
     _____)
12

13

14        The remote videoconference deposition of SERGEANT

15   GARY WHEELER, taken on behalf of the Plaintiffs, beginning at

16   9:34 a.m., and ending at 12:24 p.m., on Friday, December 18,

17   2020, before Jinna Grace Kim, a Certified Stenographic

18   Shorthand Reporter No. 14151, reported from Sherman Oaks,

19   California, licensed in the State of California.

20

21

22

23

24

25
```

```
 1     APPEARANCES OF COUNSEL:

 2
       For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:   DALE K. GALIPO, ESQ.
              BY:   RENEE V. MASONGSONG, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  rvalentine@galipolaw.com
 8

 9     For the Defendants:

10            SILVER & WRIGHT LLP
              BY:   JOHN M. FUJII, ESQ.
11            BY:   ADRIANNA C. PAIGE, ESQ.
              3 Corporate Park, Suite 100
12            Irvine, California 92606
              Tel:  (949) 385-6431
13            Fax:  (none)
              E-mail:  jfujii@silverwrightlaw.com
14            E-mail:  apaige@silverwrightlaw.com

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      Q.   And as I indicated off the record, if you need to
 2   take a break at any time, will you please let us know?
 3      A.   I sure will.
 4      Q.   Have you reviewed any documents to help prepare for
 5   the deposition?
 6      A.   Yes, I have.
 7      Q.   Can you please tell us what you've reviewed?
 8      A.   I reviewed a binder that was given to me by my
 9   counsel which included what we call a CAD history or call
10   history, Sheriff's Department call history, my statements
11   from the time the incident occurred and to our homicide
12   division, and a dispatch transcript.
13      Q.   Did you look at any photographs or videos?
14      A.   Yes.
15      Q.   And would that be both?
16      A.   Yes.  Two photographs and videos, yes.
17      Q.   Were the photographs mostly of the scene?
18      A.   Yes.
19      Q.   And what video or videos did you look at?
20      A.   I looked at body cam video from Deputy Houn, Deputy
21   Charlie Lopez, Deputy Steve Kuskowski, and the Rialto K-9
22   Units -- and I'm sorry.  I lost his name right now.
23           Those would be the ones I looked at.
24      Q.   Were you wearing a body cam at the time of this
25   incident?
```

1  captured the decedent at the time of the shooting?
2       A.   It should have.  I believe so, yes.
3       Q.   And the other videos that you have watched of the
4  other officers' body cams, do any of those show the decedent
5  at the time of the shooting?
6       A.   Yes.
7       Q.   Which one showed the decedent actually at the time
8  of the shooting?
9       A.   So to clarify, when you're saying at the time of the
10 shooting, are you talking about the entire event or the
11 actual shooting?
12      Q.   I'm talking about -- it's my understanding you fired
13 one shot; is that correct?
14      A.   Yes, sir.
15      Q.   So I'm wondering at the time you fired your shot, do
16 any of the body cams that you reviewed show the decedent at
17 the time you fired your shot?
18      A.   I can think of two videos that show it.
19      Q.   Which two are they, if you know?
20      A.   Definitely the Rialto K-9 officer, and I believe
21 Deputy Houn's.
22      Q.   Do you know how to spell his last name?
23      A.   Houn is H-o-u-n.
24      Q.   Thank you.
25      A.   You're welcome.

```
1      Q.   So one of the items that you indicated earlier you
2   reviewed was the body cam from the K-9 officers in Rialto; is
3   that correct?
4      A.   Yes.
5      Q.   And when was the last time you have reviewed that?
6      A.   It would have been earlier this week, maybe -- maybe
7   two to three days ago.
8      Q.   But it would be within the last week?
9      A.   Yes.
10          MR. GALIPO:  I think, and this is just for counsel.
11          I'm not sure we ever received that.  So we can
12  follow up later and figure that out, but if you do have that,
13  we would appreciate a copy of it because Renee doesn't think
14  we ever received it, just so you know.
15          MR. FUJII:  If it's the one -- when we sent it over
16  to you guys, it's the one that says AXON or something.
17  That's how we got it from them.
18          MR. GALIPO:  Okay.  We can figure that out later.
19          MR. FUJII:  Okay.
20          MR. GALIPO:  Renee, did you want to say something on
21  that point?
22          MS. MASONGSONG:  That's okay.  We can talk about
23  that later.
24          MR. FUJII:  But there were, as we understand it,
25  there were only four body cams, four body cams.  The Charlie
```

```
 1      Q.   And how about the Taser, do you know who deployed
 2   the Taser?  At least do you know now?
 3      A.   I know now it was Sergeant Calvert.
 4      Q.   Do you have an impression as to where the sergeant
 5   was at that point?
 6      A.   I believe it was in the same general area off of
 7   that right side of that vehicle, that Dodge Charger.
 8      Q.   Prior to you firing your shot at Mr. Ramos, did you
 9   see Mr. Ramos trying to attack anyone with the box cutter?
10      A.   Well, at this scene, no.
11      Q.   Do you see him -- and this again is prior to you
12   firing your shot.
13           Did you see him trying to stab anybody with the box
14   cutter?
15      A.   No.
16      Q.   Did you see him trying to hurt himself with the box
17   cutter at any time before you fired the shot?
18      A.   No.
19      Q.   And before you fired the shot did you have any
20   information that Mr. Ramos had seriously injured or killed
21   any person?
22      A.   No.
23      Q.   You indicated that you were the closest person of
24   the police officers to Mr. Ramos when you fired; correct?
25      A.   It would have been -- from what I recall, I was the
```

```
 1   closest of the deputies.  However, the K-9 officer was to my
 2   right, but I was in front of the K-9 officer.
 3      Q.   So would you have been a little bit closer to
 4   Mr. Ramos than the K-9 officer when you fired?
 5      A.   From what I recall, yes.
 6      Q.   And you're estimating that distance to be 35 to 40
 7   feet?
 8      A.   My distance from Mr. Ramos to myself, yes.
 9      Q.   At the point you fired did you see anybody else on
10   the side of the this chain link fence other than Mr. Ramos?
11      A.   On the same side?
12      Q.   Yes.  On the same side.
13      A.   Not in this immediate area, no.
14      Q.   Did you see anyone else on this dirt area other than
15   Mr. Ramos when you fired?
16      A.   Yes.
17      Q.   And who did you see?
18      A.   I didn't know at the time, but I saw a marked
19   Sheriff's unit at the end of the dirt alley way or the
20   easement, and it was later determined that was Deputy Alfredo
21   Lopez.  He was standing out by the left front of his patrol
22   vehicle.
23      Q.   When you say you didn't know it at the time, you
24   mean you didn't know it was a deputy, or you didn't know it
25   was Lopez, or what do you mean?
```

```
 1            MR. GALIPO:  Let's go to the next exhibit if it's
 2   ready.
 3            (Exhibit 17 was marked for identification.)
 4   BY MR. GALIPO:
 5       Q.   Now, you see yourself in this exhibit?
 6       A.   Yes, I do.
 7       Q.   Would this be after the shot?
 8       A.   Yes.
 9            MR. GALIPO:  Renee, do we have those still
10   photographs from the K-9 officer that we discussed?
11            MS. MASONGSONG:  Yes, we do.
12            MR. GALIPO:  Can you put those up, please.
13            (Exhibit 18 was marked for identification.)
14   BY MR. GALIPO:
15       Q.   So we see you in this picture near the rear of the
16   Charger; is that correct?
17       A.   Yes.
18       Q.   And this would have been shortly before you fired
19   your shot, or is it hard to tell?
20       A.   It's shortly before, yes.
21            MR. GALIPO:  Can we go to Exhibit 19, please.
22            (Exhibit 19 was marked for identification.)
23   BY MR. GALIPO:
24       Q.   Do you see yourself in this photograph?
25       A.   Yes.
```

1    Q.   Was that the shooting position you were generally in
2    when you fired?
3    A.   Yes.
4    Q.   And can you see Mr. Ramos at this point?
5    A.   Yes.
6    Q.   Was that generally the position he was in when you
7    fired?
8    A.   It looks consistent to me, yes.
9    Q.   All right.
10   A.   Well, so -- this -- I mean, from what I recall, this
11   is almost to the point of where I employ the trigger as he
12   starts to turn to the left.
13   Q.   Okay.  That's fine.
14        MR. GALIPO:  Exhibit 20, please.
15        (Exhibit 20 was marked for identification.)
16        MS. MASONGSONG:  Dale, I think that one might be out
17   of order.
18        MR. GALIPO:  That's okay.  I'll take what I can get
19   at this point.
20   BY MR. GALIPO:
21   Q.   Were you pointing your gun at him after he jumped
22   over the fence?
23   A.   That's not me.
24   Q.   I know that.  But I'm just wondering if you were
25   pointing your gun at him at all after he went over the fence.

```
 1      Q.   Okay.  So you just fired the one shot; is that
 2   correct?
 3      A.   Yes.
 4      Q.   So do you know if anyone other than you used deadly
 5   force?
 6           MR. FUJII:  Objection.  Vague.
 7           Are you talking at the scene?
 8           MR. GALIPO:  Yeah.  At the scene.
 9   BY MR. GALIPO:
10      Q.   In other words, were you the only officer, to your
11   knowledge, to use deadly force?
12      A.   To my knowledge, yes.
13      Q.   And when Mr. Ramos was climbing over the fence, was
14   any force used against him at that time, if you know?
15      A.   I don't know.
16      Q.   After Mr. Ramos got into the yard, was any force
17   used against him, if you know?
18      A.   I don't know.
19      Q.   At some point you gave a statement following the
20   incident?
21      A.   Yes.
22      Q.   And when did you give your statement in relation to
23   the incident?
24      A.   I believe it was within a week time, maybe five days
25   afterwards, five or six days afterwards.
```

1    Q.    Did you have an attorney present at the time?
2    A.    Yes.
3    Q.    And you've had a chance to review your statement
4    recently?
5    A.    Yes.
6    Q.    Your training with respect to the use of deadly
7    force, were you generally trained that deadly force was the
8    highest level of force an officer can use?
9    A.    I'm sorry.  The highest level?  Yes.
10   Q.    And were you trained that deadly force should only
11   be used if there is an immediate or imminent threat of death
12   or serious bodily injury?
13   A.    Yes, sir.
14   Q.    When you went to the police academy way back when,
15   do you recall studying POST Learning Domains?
16   A.    Actually, they were referred to as Knowledge
17   Domains, but yes.
18   Q.    Okay.  Not to date yourself at all, but --
19   A.    Right.
20   Q.    -- and do you recall that some of the training in
21   the Knowledge Domains or Learning Domains was that deadly
22   force should be a last resort?
23   A.    Yes.
24   Q.    And do you recall that deadly force should only be
25   used in the direst of circumstances?

```
 1      A.    That's where I recall him being, about 100 feet
 2   away.
 3      Q.    And I think you already told me this, but you never
 4   saw Mr. Ramos attempting to attack Alfredo Lopez, did you?
 5      A.    I never saw that, no.
 6      Q.    And you never saw Mr. Ramos attempting to attack any
 7   of the family members or people in the front yard, did you?
 8      A.    Not while I was there, no, he did not.
 9      Q.    When you shot Mr. Ramos, the people that you saw in
10   the front yard would have been on the opposite side of the
11   fence that Mr. Ramos was; is that fair?
12      A.    In the front yard area, yes.
13      Q.    And would they have been about 50 feet away from
14   him, or what would be your estimate as to how far they were
15   from Mr. Ramos when you fired your shot?
16      A.    Well, I don't recall.  There was probably four or
17   five people at least in that yard.  I do recall seeing one
18   person towards the front middle of that yard, and I were to
19   estimate, he would have been maybe 40 to 50 feet, maybe 45
20   feet in the yard.
21      Q.    But Mr. Ramos was about ten feet from the fence when
22   you shot him?
23      A.    I don't know.
24      Q.    So Mr. Ramos would have been maybe what -- 50 or 60
25   feet to that closest person in the front yard?
```

```
 1              MR. FUJII:  Objection.  I think that misstates his
 2    testimony.
 3              MR. GALIPO:  It may.  I'm just trying to get it
 4    clear.
 5    BY MR. GALIPO:
 6         Q.   You said the person was 40 to 50 feet in the front
 7    yard, and then I'm imagining Mr. Ramos is some distance from
 8    the fence.  So I was trying to put the two together to figure
 9    out how far that person in the middle of the front yard was
10    to Mr. Ramos when you shot.
11         A.   Right.  From what I recall, he was the person in the
12    front yard.  I could see out of my peripheral, my side
13    vision, was approximately 40 to 45 feet away from
14    Mr. Ramos.
15         Q.   Okay.  Did you ever hear Mr. Ramos say anything?
16         A.   No.
17         Q.   Did you form a specific opinion as to whether he was
18    under the influence of alcohol?
19         A.   I didn't have an opportunity.
20         Q.   Did you form a specific opinion as to whether he was
21    under the influence of drugs?
22         A.   I -- he was displaying erratic behavior, but I
23    didn't have an opportunity to evaluate him.
24         Q.   How did all of this start, if you know?
25              In other words, what alerted deputies initially to
```

1           CERTIFICATE

2               OF

3    CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5        I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8          That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15         Further, that the foregoing is an accurate

16   transcription thereof.

17         I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 18, 2020.

23

24   _____
     Jinna Grace Kim, CSR No. 14151
25